The Full Commission has reviewed the award based upon the record of proceedings before the Deputy Commissioner and with reference to the errors alleged. Plaintiff argues that her hand injury has not yet resolved, and that she is entitled to benefits therefor under N.C.G.S. 97-30. Plaintiff also alleges that the Form 24 was approved without jurisdiction. Plaintiff also assigns error to the Deputy Commissioner's failure to order continued medical treatment. However, after careful consideration, the Full Commission has determined that the plaintiff has not shown good grounds to amend the award. Therefore, the February 16, 1994 Opinion and Award is accordingly HEREBY AFFIRMED. Defendant's motion for attorney's fees is HEREBY DENIED.
* * * * * * * * * * *
The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties as:
STIPULATIONS
1. A Form 21 was approved by the Industrial Commission on December 15, 1989 and stipulated to an average weekly wage of $189.20 and a compensation rate of $126.13. The Form 21 stipulates to the following injury: "nerve damage to right arm and hand."
2. Plaintiff received temporary total disability benefits from the date of injury on November 9, 1989 through March 4, 1993 when a Form 24 was approved by the Industrial Commission.
3. The issues to be determined by the Commission are as follows: (1) Is plaintiff entitled to any benefits after March 4, 1993; (2) Are plaintiff's psychological problems caused by her hand injury; and (3) What amount of permanent partial disability rating does plaintiff have, if any.
* * * * * * * * * * *
Based upon all of the competent evidence in the record, the Full Commission makes the following
FINDINGS OF FACT
1. Plaintiff suffered a compensable injury to her right hand on November 6, 1989, when, while cleaning a bathroom at Heritage Greens, she slipped on a wet spot on the floor and hit her right hand on the back of the commode. Her hand injury has long since resolved, but plaintiff now pursues a claim rooted in depression and alleged "social phobia."
2. Prior to the injury on November 6, 1989, plaintiff had a sporadic work history, marital problems, and a history of drug dependency and depression. She had become addicted to Valium, Tranxene and other anti-depressants by the age of 19. Plaintiff's family physician since she was a teenager has been Martha Turner, a physician's assistant. Ms. Turner observed plaintiff's depression and tried valiantly on numerous occasions to have plaintiff evaluated at Guilford County Mental Health, referring her to that agency on May 31, 1977, June 7, 1977, November 13, 1980, April 28, 1981, July 30, 1981, July 19, 1983, and April 20, 1984.
3. Plaintiff's father was an alcoholic and left her family when she was approximately two years old. Plaintiff ran away from home at age fifteen because she did not like her mother's rules and regulations. After dropping out of school in the eleventh grade in Greensboro, she stayed in New Orleans for a short period of time, during which time she got in trouble with the law for "slitting" her neighbor's tires. At age seventeen she became pregnant and at age eighteen she gave birth to a daughter. She subsequently became pregnant in 1980, at the age of twenty, by a thirty-six-year-old married man and decided to have an abortion, which she later blamed on causing additional "stress" in her life. Plaintiff later married Kenny Cockman in 1984 at age of twenty-four. Cockman, who already had a child of his own, was "verbally abusive" and also a "very selfish man," according to plaintiff. There were no children from this tumultuous marriage, and she and Mr. Cockman split up on at least one occasion prior to the date of injury.
4. When reviewing plaintiff's reports of prior work history to 1989, plaintiff professed a "lack of memory" of prior jobs at the hearing, blurting out "I don't remember." In answer to Interrogatories, plaintiff initially claimed only the following jobs in her entire adult life: Cook's Department Store, Western Sizzler, 7-11 and "helping others clean homes" in 1986 or 1987. By contrast, plaintiff told David Steinbeck that she was "self-employed" as a "house cleaner" from 1983 through 1989, employed at 7-11 in 1982, and worked as a waitress for a period of time. In yet a third version, plaintiff told Terry Olson that she had been involved in cleaning homes for the "past 10 years" with a stable work history.
5. Plaintiff actually only worked part-time at Cook's Department Store for several months in 1976 at age sixteen, following which time she quit after a workers' compensation back injury. Plaintiff also quit work under stress at the convenience store in November 1985 (age 25) after employees were required to undergo polygraph testing to see who had been stealing money from the cash register. Plaintiff was primarily unemployed during the 1980s and complained about her nerves, which at that time were allegedly attributable to being stuck at home with two children.
6. On August 31, 1989 plaintiff was hired as a housekeeper at Heritage Greens. After working there approximately two months, she sustained a minor slip and fall and injured her hand.
7. Following the injury on November 6, 1989, plaintiff initially went to Moses Cone Hospital, where x-rays of her arm and neck were negative. She was then referred to Dr. Caffrey, an orthopedist, who saw her on November 8, 1989.
8. After he was unable to "get a reasonable exam" on plaintiff, Dr. Caffrey referred plaintiff to Dr. Ernesto Botero, a neurosurgeon.
9. Dr. Botero ordered an MRI of the neck and EMG studies of the right arm. The MRI was negative and the EMG showed possible early mild carpal tunnel syndrome. Dr. Botero believed plaintiff had a muscle strain but no neurological problems and referred her to Dr. Elizabeth Meyerdierks, an orthopedic surgeon.
10. Plaintiff first saw Dr. Elizabeth Mereydierks on January 8, 1990 with complaints of burning right hand pain extending up to her shoulder. Dr. Meyerdierks' diagnosis was median nerve compression with early reflex sympathetic dystrophy (RSD), and she recommended three stellate ganglion blocks.
11. In January 1990, plaintiff had three stellate ganglion blocks performed at Moses Cone Hospital.
12. In March 1990, after the blocks did not help, Dr. Meyerdierks ordered a bone scan. This showed a "mild uptake" in the right wrist but no uptake in the right hand. Dr. Meyerdierks agreed that this was not a "classic" RSD case because there were no significantly positive findings on the scan. In other words, it was "not dramatically conclusive."
13. In April 1990, Dr. Meyerdierks performed right carpal tunnel syndrome surgery after repeat PNCV/EMG tests showed mild carpal tunnel syndrome. Following the surgery, she referred plaintiff for physical therapy.
14. In July 1990, after therapist Robert Kretlow had found plaintiff guilty on at least two occasions of "symptom magnification syndrome," Dr. Meyerdierks approved a light duty job return at Heritage Greens. However, after returning for two hours, plaintiff complained that she was unable to do the work and was sent home by her employer, never to return again.
15. Also in July 1990, Dr. Meyerdierks referred plaintiff to Terry Olson, a psychologist associate. According to Dr. Meyerdierks, the primary purpose of the referral was for plaintiff to learn better coping skills with the pain generated by her RSD. Dr. Meyerdierks, who had begun prescribing anti-depressants to plaintiff, was unaware at the time of plaintiff's myriad psychological problems predating the injury.
16. In September 1990, Dr. Meyerdierks gave plaintiff a 40 percent permanent partial disability rating to the right hand and released her at maximum medical improvement. This was based on (1) loss of motion in the wrist (5 percent); (2) slight loss of motion in the thumb (25 percent); (3) purported loss of sensation in the thumb and no grip of strength (20 percent); and (4) pain.
17. In October 1990 Crawford and Company attempted to institute vocational rehabilitation and placement services through David Steinbeck. Mr. Steinbeck, who has a masters degree in counseling and has fourteen years of experience, was unable to proceed with vocational rehabilitation because plaintiff's psychological problems were allegedly getting worse and Terry Olson opined that plaintiff was "psychologically disabled" at that time.
18. In November 1990 Mr. Olson associated Dr. John Bartlett, a psychiatrist, to continue with anti-depressant medications which Dr. Meyerdierks had previously prescribed. Dr. Bartlett proceeded along a two year course of changing various medications constantly in an attempt to help plaintiff cope better with her various life stressors.
19. Mr. Olson advised Mr. Steinbeck in February 1991 that plaintiff was still suffering from social phobia and could only go to stores when there "would not be a lot of people around." In March 1991 Mr. Steinbeck spoke again with Terry Olson about plaintiff possibly returning to work. Mr. Steinbeck met with plaintiff and Mr. Olson at Mr. Olson's office in Greensboro on March 27, at which time plaintiff advised that she was still not able to "get into crowds" or go to the mall and that she "could not even hold a book to read." Mr. Steinbeck, believing that plaintiff's condition had worsened based on the history, concluded that vocational rehabilitation services were not "feasible" at that time and closed his file.
20. In June 1991 plaintiff was referred by Dr. Meyerdierks to the Rehab Center in Charlotte, where she was seen by Dr. Ronald Demas. Dr. Demas, who has expertise in both neurology and psychiatry, called plaintiff's situation "reflex situation dysfunction" because he felt it was "inappropriate" to say she had "true dystrophy." Dr. Demas found no atrophy or discoloring of the hand and noted that wrist flexion and extension were normal. Although plaintiff was unable to make a full fist, Dr. Demas felt this was entirely subjective, and he found no basis for her dramatically decreased grip strength in the right hand. At his deposition, Dr. Demas was shown the photographs of plaintiff performing various activities, whereupon Dr. Demas denounced these activities as highly inconsistent with plaintiff's purported complaints and opined that she could have returned to work without restrictions all along.
21. In September 1991 plaintiff's marital problems culminated in her moving to Yadkinville. She now spends increased time with her friend, June Lee Fields, who attended the hearing on plaintiff's behalf.
22. From February through June of 1992, private investigator Ed Cobbler and two of his assistants (Max Surratt and David Ross) followed plaintiff and watched her perform various activities that were completely inconsistent with reports she had been giving her physicians and Mr. Olson. Numerous photographs and three videotapes were taken of most of these activities.
23. In April 1922 David Steinbeck attempted to reinstitute vocational rehabilitation services. The first meeting was held on May 12, 1992 at her attorney's office. Plaintiff was purportedly unable to hold a styrofoam cup during this interview and indicated to Mr. Steinbeck she could "not open a car door with her right hand" or "get out in public." In a telephone conversation with Mr. Steinbeck, Mr. Olson opined that plaintiff was still unable to work.
24. On June 15, 1992 plaintiff returned to Dr. Meyerdierks for a follow-up visit for an update on her physical condition. Although there were no new objective signs, Dr. Meyerdierks was convinced after listening to plaintiff (and not having seen the photographs or videotapes) that plaintiff had gotten worse and imposed more severe restrictions of no work at all with the right hand. On that visit plaintiff was purportedly unable to holdanything in her right hand, make a fist, or register any reading on the dynamometer.
25. In September 1992, David Steinbeck, having proceeded with vocational rehabilitation anyway, located a job at Somar Telemarketing in Winston-Salem that did not involve any use of the right hand. Dr. Meyerdierks approved this job, although Terry Olson remained steadfast in his opinion that jobs like this were "too stressful" for plaintiff. Dr. Meyerdierks had been shown the videos of plaintiff since the June 1992 appointment and agreed in retrospect that plaintiff's RSD appeared to be "better."
26. On December 31, 1992, Dr. David Siegel saw plaintiff for an independent medical exam. Dr. Siegel is a hand expert from Harvard who at the time was practicing at the Hand Clinic at North Carolina Baptist Hospital and has since moved to Arizona into private practice. Plaintiff "cradled" her right hand in her left arm and refused to shake Dr. Siegel's hand and Dr. Siegel concluded that plaintiff's problem was a "factitious illness." Siegel found no signs of RSD, except for "diffuse tenderness," which is not an objective sign, and he also concluded that plaintiff did not have a loss of sensation in the thumb because she reported normal sensation on the palm of the hand and lack of feeling on the dorsum, an anatomically impossible result. Plaintiff's grip test showed that her right hand was allegedly 94 percent weaker than her left hand, another "factitious" result according to Dr. Siegel, and he found it most unusual that plaintiff would travel outside in February 1992 without gloves, since true RSD patients have severe "cold intolerance." Dr. Siegel concluded that plaintiff does not have RSD, does not have any work restrictions and has no permanent partial disability rating.
27. On January 11, 1993 defendant's attorney Clayton Custer wrote Mr. Olson and advised that Crawford Company would not pay for any further psychological treatment or counseling. Mr. Olson kept treating plaintiff for another nine months because he felt it "unethical" to stop.
28. On March 4, 1993, the Industrial Commission's Chief Claims Examiner approved a Form 24 on the basis of (1) Dr. Siegel's report, (2) the affidavit of the Somar representative, and (3) a job description of Somar with approval signed by Dr. Meyerdierks.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission makes the following
CONCLUSIONS OF LAW
1. It is the plaintiff's burden of proving not only the occurrence of an injury by accident, but also that the disabling physical injury resulted thereby. Lettley v. Trash RemovalServices, 91 N.C. App. 625, 372 S.E.2d 747 (1988). Since plaintiff did not carry the burden of proving that the problems that she now allegedly suffers were causally related to the original hand injury, she is not entitled to further benefits under the North Carolina Workers' Compensation Act.
2. The Industrial Commission is the sole judge of the credibility of a witness and it need not accept even the uncontroverted testimony of a witness. Wallace v. WatkinsCarolina Express, 11 N.C. App. 556, 181 S.E.2d 767 (1971). The deputy commissioner gave greater weight to the testimony of Dr. Siegel than to the other doctors and found that plaintiff's testimony was not credible. This is based on the testimony of the plaintiff as well as the photographs and videotapes presented by the private investigators. The Full Commission is loathe to overrule a credibility determination made by the hearing officer, and concurs with the deputy commissioner's assessment.
* * * * * * * * * * *
Based upon all of the foregoing, the Full Commission enters the following
AWARD
1. Plaintiff's claim for further workers' compensation benefits is HEREBY DENIED.
2. Each side shall pay its own costs.
3. Defendant's motion for attorney's fees pursuant to N.C.G.S. § 97-88.1 is HEREBY DENIED.
This the _____ day of __________________________, 1995.
FOR THE FULL COMMISSION
 S/ ______________________ JAMES J. BOOKER COMMISSIONER
CONCURRING:
S/ ______________________ COY M. VANCE COMMISSIONER
S/ ______________________ THOMAS J. BOLCH COMMISSIONER
JJB:mj 1/4/95